(44 South. 307.)

No. 16,497.

MILLING et al. v. SULPHUR TIMBER & LUMBER CO., Limited.

(April 29, 1907. Rehearing Denied June 29, 1907.)

1. SPECIFIC PERFORMANCE — UNAUTHORIZED CONTRACT.

As one cannot be bound by a contract which he has not authorized, which does not purport to have been made in his behalf, or name, and of the making of which he was purposely kept in ignorance, so, he has no standing to enforce the specific performance of such contract.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 38–43.]

2. SAME.

The fact that money subscribed for a particular purpose is used by the representatives of the subscribers for the purposes of a contract by which such representatives, alone, but not the subscribers, are bound, does not entitle the latter to the specific performance of such contract.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 38–43.]

3. INJUNCTION—ISSUANCE WITHOUT BOND— LIABILITY FOR DAMAGES.

The issuance and maintenance, without bond, at the instance of a litigant who demands specific performance of an alleged contract affecting certain property, of a restraining order prohibiting the owner from making an advantageous sale of such property, is unauthorized by law, and amounts to an abuse of the process of the court, and the litigant obtaining the same is liable for the damages thereby occasioned, including the fee of defendant's attorney for services rendered in the effort to have the order set aside.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 606–609.]

(Syllabus by the Court.)

Appeal from Fifth Judicial District Court, Parish of Winn; George Wear, Judge.

Action by R. E. Milling and others against the Sulphur Timber & Lumber Company, Limited. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

Wallace & Wallace, Barksdale & Barksdale, and Andrew Augustus Gunby, for appellant. Foster, Milling & Godchaux, Hudson, Potts & Bernstein, Henry Pollard Gamble, Earl Eugene Kidd, Wiley Randolph Jones, and John Henry Mathews, for appellees.

Statement.

MONROE, J. Of the 18 persons by whom this suit was brought, 8 withdrew before issue joined, leaving R. E. Milling, Louis Siess, Charles P. Mathis, John J. Peters, John H. Mathews, Henry P. Gamble, Leland D. Jones, Ebon S. Mixon, M. Bernstein, and Walter O. Allen as the plaintiffs now before the court. The allegations relied on as setting forth a cause of action are, substantially, as follows, to wit: That early in February, 1905, defendant proposed to the citizens and property owners of Winnfield that, if they would donate to it a site, within the limits of the

town, it (defendant), owning about 60,000,000 feet of timber, within milling distance, would establish a sawmill thereon, and would operate the same, cutting not less than 40,000 feet of lumber per day, during a period of not less than five years. That the citizens of Winnfield thereupon appointed a committee to solicit subscriptions for the purchase of the site, and raised $4,100, of which each of the petitioners donated a portion; but that, it being found that said amount was insufficient, B. W. Bailey, L. Siess, and O. M. Grisham agreed with defendant to pay the balance needed, provided the extra amount so paid should be returned to them, "by way of a 2 per cent. commission, out of the 10 per cent. which defendant received from its commissary." That a written agreement was entered into between the parties effecting this contract, which stipulated for the furnishing of a site, to consist of certain designated lots, and that the lots were accordingly acquired and paid for with said subscriptions and with the extra amount contributed by said parties, and were turned over to the defendant company, which thereupon erected the mill, as contemplated, to the increase of the business, the enhancement of the value of the property, and the general benefit of the citizens of the town. That the mill was operated until August, 1906, when it began to be rumored that defendant had sold its timber and proposed to cease operating, and that petitioners are informed and believe that it (defendant) is about to sell all the timber, which it was agreed and contemplated should be sawed at Winnfield, to the Grant Timber & Manufacturing Company. That said last-named company will not saw any timber at Winnfield, and the mill erected on the site donated by the citizens of that town will be closed. That, since said rumor has been in circulation, defendant has violated the contract sued on by failing to run its sawmill to its full capacity of 40,000 feet per

day. That said rumor has greatly damaged petitioners, in loss of business and depreciation in the value of their property, and will cause the loss of the amounts subscribed by them, and injure each of them in an amount exceeding $2,000. That, as defendant "has not operated its mill" to its full capacity, and as it fully intends to close said mill within the next few days, or weeks, and as your petitioners "believe that this mill and timber are the only assets of said corporation, if it is permitted to remain in possession of the same, they believe and aver that the officers of said company will take advantage of this possession to misuse and misapply the property of the corporation so as not to be able to comply with its contractual obligations to petitioners in operating the mill, as agreed to in said contract, and that they will dissolve the corporation, distribute the proceeds among the stockholders thereof, and thus place the corporation in such position that it will be unable to comply with its contract or respond in damages," petitioners are entitled "to have a receiver appointed to take charge of the mill, timber, and all property connected therewith and contemplated under the contract pending the litigation herein, * * * and * * * to a writ of injunction, * * * restraining defendant" from, in any manner, disposing of the timber or property above referred to, "or incumbering the same, or entering into any contract which will incapacitate it from fully performing the contract referred to, and from, in any manner, disposing of any timber land owned by it in the parishes of Winn and Grant which it asserted to own at the time of the contract, or did own, or has acquired since, for the purpose of being manufactured at said mill in Winnfield, which timber and timber land, according to the best information obtainable by your petitioners, is described as follows. [Here follows a description of some thousands of acres of land, by govern-

mental subdivisions.] In the alternative, if the court should hold * * * that petitioners are not entitled to a specific performance of the contract," then that the titles whereby defendant holds the lots constituting the mill site should be set aside, and that the receiver, to be appointed, should be directed to turn them over to petitioners. Wherefore petitioners pray that defendant be ruled to show cause "why a receiver should not be appointed * * * to take charge of the property and effects of said company, including the sawmill and the site and all the timber contemplated to be manufactured into lumber at Winnfield, under said contract, and that the receiver be ordered and instructed to proceed forthwith to operate said mill at its full capacity of 40,000 feet of lumber per day, and continue same until further orders of * * * court, and, in all other respects, to preserve the affairs of the corporation in statu quo. They further pray for an injunction * * * prohibiting defendant from making any disposition of any and all timber or timber land owned by it in the parishes of Winn or Grant, which was purchased or secured for the purpose of being manufactured at the mill at Winnfield, or was in contemplation of being manufactured into lumber under the contract aforesaid, and further restraining 'defendant' from making any disposition of the mill site and improvements thereon, * * * or from, in any manner, changing the status of the affairs of the corporation pending this action and the appointment of a receiver herein," and that defendant "be ordered and commanded * * * to specifically perform the contract entered into by it as herein set forth."

Also, in the alternative, for a judgment for damages against the said defendant in the sum of $2,500, each, in favor of plaintiffs herein. On this petition, a rule issued ordering defendant to show cause why a receiver should not be appointed and an injunction granted, as prayed for, and an order was made restraining defendant "from disposing of its property or changing the status of its affairs to the prejudice of petitioners." Defendant thereupon, on December 4th, moved to vacate the restraining order so made, on the grounds that no preliminary injunction had been asked for, and that it had been issued without bond, which motion the trial judge referred to the merits.

On December 10th, however, the motion to dissolve, or vacate, was called up, and, as appears from the minute entry, "was referred to the merits * * * in accordance with the ruling made December 4, 1906, day of filing," and the court thereupon issued a supplemental restraining order, or injunction, to the same purport as the original. Defendant then moved to dismiss the suit on behalf of eight of the original plaintiffs, whose authority to that effect it exhibited, and filed an exception of no cause of action, and an answer, as to the remaining plaintiffs, and the case was continued to December 17th, and, from day to day, to December 21st, when defendant moved to bond the injunction, which motion appears to have been continued, with the merits, to January 2, 1907, when it was denied, on the ground that it came too late. The defense on the merits is substantially as follows, to wit: Defendant denies that plaintiffs are stockholders or creditors, and alleges that their proceeding herein amounts to a wrongful use of the machinery of the court, to its annoyance and injury. It denies that it ever made any proposition to the citizens of Winnfield, but alleges that on February 19, 1905, it was contemplating the erection of a mill at Ruston, when certain business men from Winnfield applied to it to erect its mill at that place, and, as an inducement, proposed to subscribe and donate $2,500 for the purchase of a site, and that, pursuant to said proposition, the fol-

lowing written agreement was entered into, viz. (designated as "Deft. I"):

"This contract witnesseth that, for and in consideration of $2,500, paid on a mill site, in the town of Winnfield, said site commonly known as the 'Ice Factory Site,' and the $2,500 being donated to the * * * Company, the said * * * Company hereby binds and obligates itself to build and operate, for at least five years, a sawmill, of not less than 40,000 feet capacity, on said lot. In the event the mill herein specified is not built and operated, as herein contracted, the subscription and donation herein made shall be repaid to the donors. This contract signed in duplicate, this 10th day of February, 1905, by the * * * Company, and by H. T. Pye, representing the citizens of Winnfield, Louisiana. [And here follow the signatures.]"

Defendant alleges that, when the proposition embodied in this contract was made, it was understood that no commissariat would be established in connection with the mill, and that all the business men of Winnfield would enjoy part of the trade of said mill and its employés; but that, after vainly attempting to raise the money required for the purchase of the mill site, the parties making the proposition acknowledged that they were unable to do so, whereupon, by common consent, said contract was abrogated and abandoned, and that thereafter, on the evening of the same day, H. T. Pye (the only party, besides defendant, who had signed the same), together with O. M. Grisham, B. W. Bailey, and L. Siess, entered into another agreement with defendant as follows (designated as "Contract D"):

"This agreement entered into by and between the * * * Company, * * * party of the first part, and B. W. Bailey, Louis Siess, O. M. Grisham and H. T. Pye, * * * witnesseth:

"First. That the said parties of the second part hereby agree to give, and do give, free of cost, a mill site to the parties of the first part —said mill site to be in the town of Winnfield and composed of the Tannehill lot and the Ice Plant lot, the R. C. Jones lot and a small lot owned by the estate of R. B. Wright, deceased, and the use of part of a lot occupied by the North Louisiana Bottling Works, while said Company operates on said site a sawmill; the mill site being commonly known as the Ice Plant site.

"Second. That, in consideration of the mill site herein given, free of cost, the parties of the first part agree to build a sawmill on the same of not less than 40,000 feet capacity; to begin at once and to build the same as fast as practicable, and to operate the same for a period of five years, or more, and to give the parties of the second part two per cent. of the sales of the Commissary stores; that is, two per cent. of the sales in which the said party of the first part is interested. In witness whereof. * * *

"[Signed]     Sulphur Tbr. & Lbr. Co., Ltd.,
                      "By O. E. Hodge, Pres.
       "H. T. Pye.
       "O. M. Grisham.
       "B. W. Bailey.
       "L. Siess."

Defendant alleges that all who had subscribed for the purchase of a mill site were notified that the four parties who signed this contract had obligated themselves to furnish the same, and if they paid anything on their subscriptions it was for the benefit of said parties, and without the knowledge or solicitation of defendant, as between whom and said subscribers there was no contractual relation whatever. And defendant further alleges that, in consideration of the obligation thus assumed by said four parties, it was agreed that a commissary should be maintained by them, or some of them, which should enjoy the trade of the mill, and they should receive 2 per cent. of the sales; that, accordingly, on March 31, 1905, L. Siess, with the knowledge and consent of his co-obligors, agreed to carry on the commissary and to pay himself, and them, 2 per cent. of all sales made to employés of the mill, and to pay defendant 8 per cent. thereof, in consideration of defendant's guarantying the payment of the bills; that it further agreed that said Siess should sell goods to said employés at the same prices as to other persons, and as might be charged by other merchants; that, pursuant to said agreement, defendant secured for said Siess the trade of the mill, and that 2 per cent. of the sales, amounting to $750, were paid to the Bank of Winnfield for the account of said four contracting parties, who received the same, with

the exception of H. T. Pye, who declined to do so. Defendant further alleges that, in violation of said agreement, Siess frequently charged the employés of the mill more for goods sold to them than would have been charged by other merchants, and that, receiving complaints upon the subject, defendant's president notified him thereof, and that he acknowledged the truth of the complaints and promised to adhere to the contract, but that he failed so to do, and continued to give short weight and to charge excessive prices, until, in justice to · its employés, defendant was obliged to stop dealing with him; that his three associates, recognizing that he was at fault, and that defendant had acted in good faith, have refused to join in this suit; and that defendant had been damaged by his said violation of contract in the sum of $2,500. Defendant further alleges that said four parties failed to furnish sufficient ground for the mill site, but that defendant erected a mill "of 50,000 capacity," in Winnfield, invested over $100,000 there, established in the town an enterprise paying salaries and wages to the amount of $8,500 per month, and caused the business of the town to increase in volume and the property to enhance in value; that plaintiffs' demand for damages is fictitious, and made in bad faith; that they had no reason to believe that defendant intended to sell all of its property or to cease operating its plant, or to dissolve, or to do anything else to disable it from complying with its contracts; that in September, 1906, defendant's planing mill was destroyed by fire, and was rebuilt at great expense; that, in connection with the light for its plant, defendant has established an electric light system for the town, under a 25-year franchise, and it has recently bought additional timber lands, and is operating its plant up to the present time; that, notwithstanding that these facts were well known to plaintiffs ("who only claim to have sub-

scribed and contributed nominal sums to aid the four contracting parties to purchase the mill site"), they proceeded, without any demand on defendant or any putting in default, to bring this suit for specific performance of an alleged contract which never existed, to have a receiver appointed to take defendant's property out of its possession, and to recover exorbitant damages, and, in connection with its inconsistent demands, obtained a restraining order enjoining defendant from disposing of its property, pending this application for a receiver; that this order was obtained on November 26, 1906, without bond, and after defendant, on December 4th moved to vacate the same, plaintiff caused another of said orders to be served, also without bond, and without justification; and that defendant has thereby been damaged in the sum of $10,000, in loss of time, vexation, attorney's fees, disturbance to business, and loss of interest on the purchase price of a portion of its timber lands.

It therefore prays that plaintiff's demands be rejected, and that it have judgment, in reconvention, in the sum of $12,500. After the filing of the answer, plaintiffs filed a supplemental petition, alleging that a judgment requiring specific performance of the contract sued on will, alone, meet the demands of justice. And, upon the issues thus presented, the case was tried, and there was judgment for plaintiffs, requiring defendant "to carry out and specifically perform its contract with plaintiffs, by the operation of its sawmill plant * * * for the unexpired portion of the five years from the date it commenced operating said mill, and, in said operation, to log and cut and manufacture, at said mill and plant, during said period, the merchantable pine and oak timber owned by said defendant company in the parishes of Winn and Grant, approximating 62,000,-000 of feet, or as much thereof as can be

cut during the unexpired portion of the five years under which the said mill was to be operated at the usual run and cut of mills of the capacity of defendant's mill as heretofore run"; and further decreeing "that, until the execution of this judgment and the further order of this court, and in furtherance thereof, the said defendant company is hereby restrained from selling or otherwise disposing of its mill plant, situated in the town of Winnfield, or its merchantable pine or oak timber, situated in the parishes of Winn and Grant, other than by cutting and sawing and manufacturing said timber into lumber in the ordinary course of business, as contemplated by the parties hereto." Plaintiffs' demands, in other respects, as also the demands, in reconvention, of defendant, are rejected, and defendant is condemned for the costs. From this judgment, defendant has appealed, and plaintiffs answer, praying that the judgment appealed from be amended by granting their demand for the appointment of a receiver.

The facts, as disclosed in the record, are as follows, to wit:

In January, 1905, it became known to some of the enterprising citizens of Winnfield that the defendant company, which owned large tracts of timbered land in the parishes of Winn and Grant, was considering the question of establishing a sawmill at Ruston, in the parish of Lincoln, and they at once opened negotiations with the officers of the company, with a view of having them select Winnfield, instead of Ruston, as the site of the proposed plant, and induced O. E. Hodge, president and general manager, and B. F. Thompson, a director, to visit Winnfield, where they attended a meeting of some 10 or 15 citizens (held in the office of a real estate agent), to whom, Mr. Thompson, speaking for the company, submitted a proposition to the effect that, if they (the citizens) would furnish the site, the company would establish its mill at Winnfield. In-

cidentally, the idea was conveyed that the company would expect its property to be exempted from municipal taxation for 10 years; that the citizens would assure it protection for its labor; that the company would not maintain a commissariat, but would leave the trade of its employés to the merchants of the town; that the mill, to be erected, would have a capacity of not less than 40,000 feet of lumber per day; that, as the company owned more than 60,000,000 feet of standing timber in that part of the country, it would require from five to eight years to saw it; and hence that the mill, when once established, would probably be kept in operation during that length of time. We have used the word "probably" advisedly, for the reason that, after careful consideration of the evidence adduced, our conclusion is that, though the idea with reference to the period during which the mill was to be operated was predicated upon what was then the expectation and purpose of the defendant, it was the understanding and intention of the parties, not that defendant should be bound, without regard to conditions which might arise in the future, to manufacture 40,000 feet of lumber per day, for five years, or to convert any particular timber into lumber, but that, if, for any reason, it should not establish and maintain the mill, as it proposed, and then expected, the citizens would be released from the obligations assumed by them. Of the 10 plaintiffs now before the court, C. P. Mathis appears to be the only one who was present at the meeting in question. Being asked what Mr. Thompson said, as to the timber owned by defendant, where it was located, and what would be done with it, in case the mill site was furnished, he answered:

"Well, he said that they had about 80,000,000 feet of timber. * * * It was located south of Winnfield. * * * If the citizens would furnish him with a site, he would put the mill

here, it would take somewhere between 5 and 8 years to cut that timber up."

O. M. Grisham, who took rather a more active part in the whole affair than any other citizen of Winnfield, being called as a witness for plaintiffs, and interrogated by their counsel, says:

"Mr. Thompson, I think, on that occasion made a speech, and made, perhaps, what you might call a proposition, in response to the solicitations we have already given them, and I believe that Mr. Thompson's statement was about this: That, if the town of Winnfield would exempt the mill property from municipal taxation for 10 years, and would protect their labor—that is, negroes from being run off by white cappers or parties interfering at that time —and give them a mill site, free of cost, that would be approved by the mill company, that they would locate and build a sawmill in the town of Winnfield that would cut not less than 40,000 feet of lumber per day, and that the mill would not put up any commissary. I believe that is about the proposition. Q. What, if anything, did he say about the timber, as to how much they had, and how long they could run, etc.? A. I can't say exactly what he said about the timber. I was familiar with the tract of timber that they owned, and it was generally understood by us that knew anything about the timber that there was something like 80,- 000,000 to 100,000,000 feet of timber, and I believe this question was discussed that night, that the timber lay southeast of Winnfield, and that it would take something like seven years to cut up what they owned."

Dr. I. E. Siess, who presided at the meeting (also testifying on behalf of plaintiff), says:

"Mr. B. F. Thompson was the spokesman for the lumber company. He stated that, if the citizens of Winnfield would buy the site for the mill, they would erect the mill here. * * * That was about the substance of the meeting."

The witness further testifies that something was said about the timber on hand, and about the length of time that the mill was going to run; but he is unable to remember what it was.

Mr. Hodge, defendant's president, says:

"My recollection is that the body of the proposition between the two parties, and all that we talked, was the erection of the mill, and, of course, we owned this timber south of here, but I don't remember whether that particular timber was referred to or not. The main body of the proposition was erecting the mill here, if the citizens would give the mill site. The most of the men present at that meeting were merchants, and it was agreed that there would be no commissary if we would locate the mill here, if we got the mill site, and it was naturally supposed that this was the timber that we would cut here, as we had owned the timber that we had some time previous to that time. Q. What I have asked you was: Is it not a fact that Mr. Thompson stated, in detail, at this time that you have referred to, that the timber amounted to 65,000,000 feet, or more, and that the mill would operate at least five years, and probably more, to cut this timber; wasn't that stated by him? A. I don't remember the details, Mr. Bernstein, but I think that the timber referred to then was sufficient to operate that length of time. I think that was the general gist of what he was talking."

As a result of the meeting, a suitable site was selected, and several citizens were appointed, or assumed the appointment, to solicit subscriptions for its purchase, and they used in that connection lists bearing the following legend, to wit:

"Winnfield, La., Jan. 30, 1905.
"This is to certify that we, the undersigned, will pay the amounts opposite our names, for the purpose of buying a site for a saw and planing mill, to be erected within the corporate limits of Winnfield and by the Sulphur Timber & Lumber Company, which amounts to be paid at the signing of this agreement, with the understanding that said amounts be returned to all parties that have paid in to the committee if said company does not erect said mill as per agreement."

The owner of the site selected, however, raised the price, and, the idea of buying it having been abandoned, another site (known as the Ice Plant, and consisting of several lots owned by different persons) was chosen; but, as the price exceeded the aggregate amount of the subscriptions which had been obtained, and as those in charge seemed to think they could obtain no more money in that way, there was some further negotiation between them and defendant's president, in the course of which he offered, in behalf of the company, to contribute $1,000, provided the right were conceded to the company to establish and maintain its own commissariat. This suggestion was, however, not made to the subscribers at large, but only to the few

who were actively moving in the matter, and was not much considered, because it was found that $1,000 would not be enough to make up the amount required for the purchase of the Ice Plant site, and the company was unwilling to contribute any more. In this situation, the whole scheme was about to fail, and Hodge, defendant's president, was on the point of leaving Winnfield in order, again, to take up the Ruston proposition, when at the solicitation of Dr. Siess, Mr. Grisham, and perhaps others, he was induced to remain and consider a plan submitted to him by Grisham and others, with the result, that contract "Deft. I" was entered into, and this was followed, in the evening of the same day, by the making of the "Contract D."

For the further carrying out of the understanding, thus partially expressed, the following additional agreement ("Deft. 6") was reduced to writing and signed, to wit:

"Contract.

"March 31, 1905.

"This contract, made and entered into between the Sulphur Timber & Lumber Company, Ltd., parties of the first part, and L. Siess, party of the second part, witnesseth:

"The party of the first part agrees to construct and operate a sawmill in the town of Winnfield, Louisiana, and further agrees that they will have no commissary, owned and controlled by themselves; that they hereby bind themselves to throw all their employés' trade to the party of the second part for a period of five years. The party of the second part hereby binds himself and agrees to furnish a stock of goods in his store sufficiently large to meet the demand and as is ordinarily carried in mill commissaries, and the said party of the second part further agrees that the prices he charges the said employés of the party of the first part will not exceed the price made to parties not employed by the party of the first part. The party of the second part further agrees that his prices, in general, will not exceed other merchants on the same articles in the town of Winnfield. The consideration of this contract is that the party of the second part, his successors or assigns, is to pay parties of the first part, their successors or assigns, eight per cent. on all goods sold to employés of party of the first part, for a period of five years, and it is further agreed that parties of the first part keep the account of their said employés. so that party of the second part can ascertain the debit

or credit balances of said employés. Said party of the first part further agrees to collect all accounts of their employés for party of the second part when said party of the second part was instructed by bookkeeper, or 'timekeeper', to make such sales, and if parties of the first part fail to make such collections from employés, then the parties of the first part are to pay to party of the second part the amount of such sales as they have instructed the party of the second part to make. It is further agreed that parties of the first part are to pay party of the second part once in each month, and not later than the fifteenth of the following month, for previous month's business.

"[Signed] Sulphur Tbr. & Lbr. Co., Ltd.,
"By O. E. Hodge, Pres.
"L. Siess.
"Witnesses party first part:
"H. T. Pye.
"B. L. Anderson."

\*   \*   \*   \*   \*   \*

Pye, Grisham, Bailey, and Siess then furnished, say, $2,600, which with, say, $1,500 subscribed by others, was needed to make up the $4,100 required to pay for the Ice Plant site; that is to say, Pye increased his original subscription of $500 to $643, and the others, who had originally subscribed less than he, increased their subscriptions to the same amount. And thereafter, the mill having been established, Siess was accorded a monopoly of its trade and divided 10 per cent. of the profits made thereon, in the proportion of 8 per cent. to defendant and 2 per cent. to himself and his associates (as named in Contract D), save Pye, who declining to receive the share coming to him, the same was turned over to the others.

It is shown that the making of the Contract D and "Deft. 6" was kept secret, and that the plaintiffs now before the court knew nothing more than that Pye, Grisham, Bailey, and Siess had undertaken to make up the balance needed for the purchase of the mill site.

Dr. I. E. Siess, who presided at the meeting to which we have referred, testifying, on behalf of plaintiff, as to the situation at the time that the owner of the site first selected. raised his price, says:

"Well, at that time, I was afraid that I, or we, would not succeed in raising money enough to buy the site. We were being held up, * * * and I made it known to the others, or, I should say, several of the others, and Mr. Hodge, at that time, told me that he thought it would be useless to monkey around Winnfield any longer, that he had a bonus offered him at Ruston, and that he could go there. I asked him, however, to remain until next day, if he could, possibly, and that perhaps some arrangement could be made, and we might find some way of securing the site. Next day, several of the citizens met at the Bank, while I was away, and on my return I was informed that they held this meeting, and that the question of a site could be arranged, and I inquired where, and they informed me what site, and I knew it was so very high that I did not see how it could be arranged, and I told them that I would solicit no further subscriptions, as I saw no chance of arranging for the subscription for the site. Q. Who did you appoint to go on with the work? A. I turned the money I had collected over to Mr. Pye, with the understanding that the citizens were to be reimbursed the money I had collected, and, during that day, I heard that there might be an arrangement made. [Here some objections were interposed and rulings made.] Q. Under what conditions did you solicit those subscriptions? A. Well, the conditions were that, in the event that the mill site was not purchased, or the mill was not built, they were to have their money back, or, in the event that a store or commissary was operated by the company, the money would be refunded. Q. When you turned the money over to those gentlemen, to take the matter up after you left it, what gentlemen did you turn it over to to take it up? A. This money, together with the list, was turned over to Messrs. Grisham, Pye, L. Siess, and B. W. Bailey. Q. What instructions did you give as to the manner in which you had collected the money, concerning the commissary? A. I told those parties when I turned them over the papers, together with the money, that the understanding was that this money was to be refunded if a commissary was put up, and that I did not want any other arrangements made, unless that was carried out, in so far as those I had solicited were concerned. I afterwards inquired as to whether it was carried out, and was informed that it was. I also asked a few of those who had subscribed if it had, and they assured me that it was. * * * Cross-Examination : Q. Doctor, do you say that you turned this matter over to H. T. Pye, B. W. Bailey, L. Siess, and O. M. Grisham, as a committee? A. I did not say a committee; no, sir. * * * Q. Did you not know that those four gentlemen had entered into a contract, in lieu of the original contract? A. I was not aware of anything at that time. I did not know that they had entered into anything of the kind, at all. Q. Were you not aware that they had entered into a contract, providing for a commissary, and that they were to receive 2 per cent. of the commissary sales, on the very day that you had turned this matter over to them? A. No, sir ; I did not know that, and it was several weeks afterwards that I learned that they had entered into this contract. Q. Those four gentlemen? A. Yes, sir. Q. Have you ever seen that contract? A. I have seen it since this litigation ; yes, sir. Q. When did you learn that those gentlemen were to receive 2 per cent. of the commissary sales? A. I can't say when. Q. Did you learn it one month after the 10th day of February? A. No, sir; it was not the next month. It must have been six months, may be."

Mr. Mathis gives the following testimony on this subject:

"Q. Do you know anything about this contract D? A. No, sir. Q. You never knew that those four parties had made a contract obligating themselves to give a site in consideration of the 2 per cent. commission? * * * A. I was never notified that those four gentlemen were to guaranty the site, but I was notified that those four gentlemen were to supplement enough to the amount that was subscribed to finish paying for the site."

M. Bernstein, plaintiff, has not appeared as a witness in the case, but his nephew, L. Bernstein, testifies that his uncle subscribed $150 (on one of the lists which have been heretofore referred to) but, he does not remember whether he was present at the time; and he further testifies as follows:

"Q. You never did know that those four gentlemen signed that contract? A. Not until this suit was filed. Q. The contract I referred to is this, Mr. Bernstein, did you know that those four gentlemen, L. Siess, H. T. Pye, B. W. Bailey, and O. M. Grisham, had, unconditionally, guarantied, and obligated themselves to purchase the site, and, in consideration, were to get 2 per cent. commission therefor as expressed in contract marked 'Deft. D'? A. I did not. Q. Did your uncle know anything about it? A. I don't think he did. Q. Until this suit was filed? A. No, sir."

It appears from the evidence that the establishment and maintenance of the mill at Winnfield has been of great advantage to the town, and several of the witnesses testify that they have been more than compensated for their subscriptions to the purchase of the site. It also appears that, in the summer of 1906, defendant entered into negotia-

tions for the sale of the plant, together with its logging outfits and timber holdings, and finally concluded a bargain with the Grant Timber & Manufacturing Company, for the sale of its timber, with the exception of about 12,000,000 feet; and that its president gave it to be understood that the mill would close down about January 1, 1907.

There can be no doubt that the loss of a manufacturing concern, such as that of defendant, which pays out some $8,500 per month in salaries and wages, would be a serious one to a town like Winnfield. On the other hand, the prosperity of the place seems to be of such sturdy growth that we are unable to discover that any specific damage has been sustained by reason of the rumored possibility of such loss, and defendant's president denies that any definite conclusion as to the shutting down of the mill had, or has ever, been reached, though he admits having stated that he did not know what would be done. The reason given by him for the sale of the timber is that it will be profitable for the company, and we have no doubt that he acted in the belief that he had the right to make the sale, without obtaining the permission of the citizens of Winnfield, and without incurring any obligation to them, save to the possible extent of their donation, to which obligation he (as representing defendant) appears to be ready and able to respond. It is shown that defendant and its stockholders have invested something like $100,000 in Winnfield, and, since the sale to the Grant Company, that defendant has made a contract with the Huie-Hodge Company, whereby it can log its mill for 10 years, or more. It is also shown that, after its negotiations with the Grant Company, defendant's planing mill was burned, and that it was immediately, in the fall of 1906, rebuilt, and we find nothing in the record to justify us in holding that there has ever been any intention to discontinue the operation of that part of the plant.

## Opinion.

When, at the conference in January, between defendant's president and Thompson, one of its directors, upon the one hand, and a few of the citizens of Winnfield, on the other, it was proposed by Thompson to the citizens present, and through them to the others, that defendant would establish its mill in the town, if certain conditions were complied with, no one accepted the proposition, and there was no contract. All that the citizens participating in that meeting undertook to do, and all that they were then expected to do, was to confer with each other and with their fellow citizens, who were not present, and, by co-operation, obtain a sufficient sum of money to enable them, together, to accept the offer which had been made, and furnish the mill site, on the terms proposed. They needed, as it turned out, $4,100, but only about $2,500 were subscribed, and the attempt to furnish the site by that means was abandoned as a failure. Four of the citizens, who had been, in part, representing the others, then took hold of the matter and submitted a new proposition, looking to the accomplishment of what was considered the main purpose (i. e., the establishment of a new industry in the town), but involving conditions quite different from those upon which the subscriptions had been obtained, and they, individually, and the defendant entered into a contract to which the citizens at large were not parties, which was not made in their names or behalf, and of which they were purposely kept in ignorance, and it is the contract so made of which plaintiffs, as citizens at large and subscribers to the site fund, are now demanding specific performance. The answer to this demand is that, as the contract is not theirs, and does not bind them, they cannot enforce it. It is true that Messrs. Pye, Grisham, Siess, and Bailey, having in their possession, say $1,500, which had been contributed by plaintiffs and others for

a specific purpose, used it for the purposes of the contract in question, and they thereby, no doubt, incurred some obligation to the contributors, which obligation, as he understood it, Mr. Pye appears to have recognized in making the contract "Deft. I," and in declining to receive, for his own use, any part of the commission on the commissary sales. It is, however, impossible to blend contract "Deft. I," between defendant and Pye (in which Pye represents the citizens) with contract D, between defendant and Pye, Grisham, Siess, and Bailey (in which the four last-named represent themselves), and it is equally impossible for Mr. Pye to give to the plaintiffs any enforceable right in Contract D (which imposes no obligation on them), merely by declining to receive a profit, which, by the terms of the contract, inures to him, and to no one else. What obligation Messrs. Pye, Grisham, Siess, and Bailey may have incurred to plaintiffs by reason of the use made of the money contributed by the latter is apart from the present question, though, it may be remarked, in that connection, that, of the $4,100 required for the purchase of the mill site, the four citizens named contributed five-eighths, whilst the plaintiffs, other than Siess, contributed less than one-eighth, and that they and the other contributors either consented that their money should be used in the purchase of the mill site, notwithstanding that a commissary was established, and that the mill trade was not divided among them, as originally contemplated, or they acquiesced in that arrangement, and are not now complaining of it, nor are they complaining that their representatives—that is to say, those having control of their money—so arranged matters as to secure to themselves an interest in the profits of the commissariat. To the contrary; they are seeking to enforce specific performance of the contract by which that interest was secured, upon the theory that it was made for them, and is their contract,

and this, in spite of the contract itself, which speaks for itself, of the acts and testimony of the parties, and of the fact that its principal obligation, i. e., the absolute obligation to furnish the mill site, is one, the failure and refusal of plaintiff and the other citizens to assume which was the sole reason for its making, by Messrs. Pye et al., in their individual capacities. It is clear that this theory will not support the plaintiff's demands, and it is equally clear that such demands cannot be sustained upon the theory that defendant, by becoming a party to the use made of plaintiffs' contributions, obligated itself with respect to the conditions upon which that money was contributed, since, assuming that to be true, the most that could be demanded, if defendant had, in fact, closed the mill, would be that it should refund the contributions, or perhaps, under Contract D, surrender the mill site. As to plaintiff Siess, he is, apparently, undertaking to sue, upon Contract D, only in so far as he may be found to have a standing for that purpose in common with his coplaintiffs, and he and they successfully objected to the introduction in evidence of the contract "Deft. 6," relating to the maintenance of the commissariat (as provided for by Contract D), and to evidence sought to be introduced concerning the manner in which the provisions of the Contract D, upon that subject, had been executed; the ground of objection being that the evidence was irrelevant. It was shown on the trial that, apart from the land included in the sale to the Grant Timber & Lumber Company, defendant owns unincumbered real estate, in Winn parish, to the value of $60,000, or more. Upon the other hand, whilst some of the plaintiffs subscribed for the purchase of the site in question with the understanding that, if the conditions upon which they subscribed should not be complied with, their money should be returned, the understanding with which others subscribed is left in doubt, in fact, in some instances, it is

not legally established that they suscribed at all, since the subscription lists were admitted in evidence over the objection of defendant's counsel, without proof of the signatures, and there are four of the plaintiffs who have not testified in the case. The aggregate amount subscribed by plaintiffs (assuming all of the alleged subscriptions to have been proved) is about $1,000, and, deducting the contribution of L. Siess, the aggregate amount said to have been subscribed by the other nine is less than $400, and, according to the evidence, those subscriptions have already been fairly compensated by the increase in the business and enhancement in values resulting from the establishment and operation of defendant's mill. Under these circumstances, considering the utter disproportion between plaintiffs' outlay and the return demanded by them; considering the lack of either legal or equitable basis for their demands, as made; considering the entire responsibility of defendant with respect to any obligation that may rest upon it in the premises; and further considering that the transaction complained of is shown to be highly advantageous to defendant, and hence advantageous to its stockholders and legitimate creditors—the application for the appointment of a receiver was without reason and vexatious, and the obtention and maintenance, without bond, of the preliminary restraining order, was unauthorized by law, and amounted to an abuse of the process of the court. That the question of the dissolution or rescission of that order was not heard and determined apart from the merits of the case was not the fault of the defendant, and we are of opinion that the testimony offered to prove the value of the services rendered by its attorney, in that behalf, should have been heard. As we understand the record, the vendee was not ready, at any time prior to the rendition of the judgment, to receive and pay for the property, the sale of which was enjoined. Hence

the restraining order did not deprive defendant of the use of the price during that period, and for such deprivation, if it has occurred, since the rendition of the judgment, plaintiffs are not liable. Defendant's claim for damages resulting from vexation, loss of time, and injury to business is, in part, inadmissible, and otherwise not proved.

For the reasons thus assigned, it is ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that plaintiffs' demand be rejected. It is further adjudged and decreed that defendant's reconventional demand be rejected, save in so far as the same relates to the fee of its attorneys for services rendered in the effort to set aside the restraining order herein issued, with respect to and for the further consideration of which, in accordance with the views expressed in the foregoing opinion, the case is remanded to the district court. It is further adjudged and decreed that plaintiffs pay all costs.

BREAUX, C. J. I concur in the opinion and decree, except as relates to fees of attorney.